## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**KYLE HALLE, Individually and On
Behalf of Others Similarly Situated**

**VERSUS**

**GALLIANO MARINE SERVICE, LLC
and C-INNOVATION, LLC**

**CIVIL ACTION**

**NUMBER:  15-5648**

**SECTION:  "L"
JUDGE ELDON E. FALLON**

**MAGISTRATE DIVISION:  (5)
MAG. JUDGE MICHAEL B.
NORTH**

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION TO DECERTIFY FLSA COLLECTIVE ACTION

COMES NOW Defendants, Galliano Marine Services, L.L.C ("GMS") and C-Innovation, L.L.C.,

("CI"), by and through their attorneys of record, and respectfully submit this Memorandum in Support of

Motion to Decertify FLSA Collective Action, as to the lawsuit filed by Plaintiff Kyle Halle ("Plaintiff" or

"Halle").

### I. INTRODUCTION

A FLSA collective action is to be decertified when plaintiffs fail to demonstrate that FLSA

collective action claimants are "similarly situated," as defined in *Mooney v. Aramco Servs. Co.*, 54 F.3d

1207, 1216 (5th Cir. 1995) and *Lusardi v. Xerox, Corp.*, 118 F.R.D. 351 (D.N.J. 1987).  Claimants are not

similarly situated and thus, this conditionally certified collective action is appropriate for decertification

because: (1) the employment settings of the claimants are disparate; (2) Defendants have numerous

individuated FLSA defenses; and (3) general fairness and procedural considerations weigh against

certification.  Likewise, courts properly grant decertification where, as here, there are clear and significant

inconsistencies between Kyle Halle's earlier sworn declaration to this Court, and his more recent sworn

deposition testimony.  Defendants respectfully request the instant Motion to Decertify FLSA Collective

Action be granted, decertifying the named-Plaintiff's FLSA claims and dismissing the FLSA claims of the non-party opt-in claimants.

## II. FACTUAL HISTORY

For purposes of this Motion to Decertify FLSA Collective Action, to avoid unnecessary duplication on the docket and for clarity and the convenience of the Court, Defendants will utilize by reference the factual history, cited exhibits, sworn testimony and arguments contained in Defendants' previously filed Memorandum in Support of Motion for Summary Judgment[1] and Supplemental Memorandum in Support of Motion for Summary Judgment.[2]

### A. C-Innovation's Operation of ROVs

Defendant CI is in the business of operating Remotely Controlled (underwater) Vehicles ("ROV") to conduct subsea construction, demolition and inspections of subsea assets, and to survey the sea floor for upcoming projects for CI's oil industry clients.[3]  ROVs are used when water depth or weather conditions preclude the use of human divers.[4]  For ROV operations to take place, the ROV system must be installed on a vessel which is referred to as an ROV Support Vessel ("ROVSV").[5]  In this case, the M/V Alyssa Chouest, the ROVSV on which Halle worked, was dedicated exclusively to CI's ROV operations and its exclusive mission was to facilitate and support those operations.

### B. Plaintiff's Employment with C-Innovation

Halle first became employed with CI in April 2009.[6]  For purposes of this matter, Halle worked as an ROV Supervisor for CI aboard the ROVSV M/V Alyssa Chouest from June 2012 until September 23,

---

[1] See Docket No. 112-2 (Defendants' Memorandum in Support of Motion for Summary Judgment).
[2] See Docket No. 128-1 (Defendants' Supplemental Memorandum in Support of Motion for Summary Judgment).
[3] See Docket No. 112-3 (Pages 4-5) (Kyle Halle Deposition).
[4] See Docket No. 112-3 (Pages 4-5) (Kyle Halle Deposition).
[5] See Docket No. 112-3 (Pages 7-8) (Kyle Halle Deposition).
[6] See Docket No. 112-4 (Pages 1-2) (April 23, 2009 Offer Letter); Docket No. 112-3 (Page 53) (Kyle Halle Deposition).

PD.27513897.1

2015, which was the last day he worked for CI.[7]  A CI ROV Crew working on board an ROVSV would consist of three employees: an ROV Supervisor and two Pilot Technicians who would be under his supervision.[8]  Halle testified he and his Crew would work a twelve-hour shift and would be replaced by another Crew for the subsequent twelve-hour shift.[9]  Halle and the other ROV Crew members would work offshore for four weeks and would then be off the ROVSV and not working for two weeks.[10]

While Halle acknowledges other CI employees conducted ROV operations in foreign waters, his work on the M/V Alyssa Chouest was exclusively confined to the Gulf of Mexico on a U.S. vessel.[11] Captain James Alfrey was the Master of the M/V Alyssa Chouest during the time period Halle was conducting ROV operations on the ROVSV.[12]  Halle testified that Captain Alfrey had a good understanding of what was going on with ROV operations.[13]  The Alyssa Chouest exclusively supported the ROV operations provided by CI to one of its oil company clients, and worked with the ROV Crew to accomplish the tasks required by CI's customers.[14]  In his deposition, Halle acknowledged that the purpose of an ROVSV is to get the ROV where it is supposed to be so it can do its undersea operations.[15]

## C.  Operation of ROV System

An ROVSV has to be specially outfitted with the ROV system, which consists of a winch, an A-Frame, a hydraulic power unit which receives electrical power from the ROVSV's generator, and a Control Van.[16]  The ROV system is entirely dependent on the ROVSV's generator for all power for ROV

---

[7] See 112-5 (Pages 1-2) (Photographs of ROVSV M/V Alyssa Chouest); Docket No. 112-3 (Page 6-7, 75) (Kyle Halle Deposition).
[8] Docket No. 112-3 (Pages 35-36) (Kyle Halle Deposition).
[9] Docket No. 112-3 (Page 34) (Kyle Halle Deposition).
[10] Docket No. 112-3 (Pages 10, 77) (Kyle Halle Deposition).
[11] Docket No. 112-3 (Pages 11-12) (Kyle Halle Deposition).
[12] Docket No. 112-3 (Page 9) (Kyle Halle Deposition).
[13] Docket No. 112-3 (Pages 9-10) (Kyle Halle Deposition).
[14] Docket No. 112-6 (Pages 1-5) (Declaration of Captain James Alfrey).
[15] Docket No. 112-3 (Page 14) (Kyle Halle Deposition).
[16] Docket No. 112-7 (Page 1) (Photograph of ROVSV); Docket No. 112-3 (Pages 15-16) (Kyle Halle Deposition).

operations.[17]  The winch contains approximately 1000-2000 feet of steel braided cable which encases the fibers for power, video and control of the ROV.[18]  The winch will lower the ROV to the desired depth, and from there, the ROV will detach from the Tether Management System ("TMS"), which will then spool out additional yellow colored tether containing the same power, video and control fibers, allowing the ROV to navigate freely and perform its subsea tasks.[19]  Inside the Control Van, two members of the ROV Crew serve as pilot and copilot of the ROV.[20]  The two Crew members articulate joysticks to navigate the ROV utilizing multiple thrusters, and also operate articulated mechanical arms to perform any number of subsea tasks.[21]

The CI ROV Crews also had direct control over an ROVSV mounted navigational system, referred to as "USBL", which is a method of underwater acoustic positioning and stands for "ultra-short baseline."[22]  It is undisputed that among the duties performed by the C-Innovation ROV Crews aboard an ROVSV is the operation, utilization and maintenance of the USBL system.[23]  The purpose of the USBL system is to provide the position of a subsea transponder relative to the USBL.[24]

The USBL system must be deployed from the ROVSV to ensure the ROV is being tracked prior to deploying and diving the ROV.[25]  The USBL system consists of a deployment mechanism

---

[17] Docket No. 112-3 (Page 14) (Kyle Halle Deposition).
[18] Docket No. 112-8 (Page 1) (Photograph of ROV Winch); Docket No. 112-3 (Pages 18-19) (Kyle Halle Deposition).  In actuality, the winch contains between 12,000 and 13,000 feet of umbilical and the TMS contains an additional 1,000 to 2,000 feet of tether, but for purposes of this Motion and Defendants' Summary Judgment Motion, Defendants will utilize the incorrect information provided by Halle in his deposition.
[19] Docket No. 112-9 (Page 1) (ROV and Tether Management System), Docket No. 112-3 (Pages 19-21) (Kyle Halle Deposition).
[20] Docket No. 112-10 (Page 1) (Photograph of ROV Crew Members at Controls); Docket No. 112-3 (Pages 26-27) (Kyle Halle Deposition).
[21] Docket No. 112-11 (Page 1) (Photograph of Work Performed by CI ROV); Docket No. 112-3 (Pages 26-27) (Kyle Halle Deposition).
[22] Docket No. 128-2 (Declaration of Michael MacMillan). **[CONFIDENTIAL – FILED UNDER SEAL PURSUANT TO MOTION/ORDER TO SEAL]**
[23] Id.
[24] Id.
[25] Id.

that is permanently mounted into the ROVSV's hull by way of a gate valve.[26]  The gate valve is remotely opened and closed by the ROV Crew to allow the USBL transducer to be deployed through the hull of the ROVSV and into the water.[27]  The ROV Crew opens the gate valve via a control panel[28] to lower a USBL cylinder, commonly referred to as a USBL pole, with a transceiver head approximately 3 meters into the water underneath the hull of the vessel.[29]  The referenced photographs show a USBL deployment mechanism and USBL pole installed through the deck of an ROVSV,[30] as well as a USBL pole prior to installation in a vessel.[31]  Once deployed, the transceiver is used to send and receive signals to transponders in the water.[32]

The transponder may be attached to the ROV, a subsea asset, subsea marker on the seafloor, crane line, or other underwater feature, as shown in the referenced illustration.[33]  All the information obtained by the USBL system, is displayed on monitors in the ROV Control Van as well as monitors in the ROVSV bridge.[34]  The USBL monitors provide ROVSV <u>and</u> ROV information to the Master and ROV Crew, including location, speed, depth, heading, and other navigational information.[35]  This detailed information is used to coordinate and assist in the navigation of the ROVSV to facilitate ROV operations, vessel operations, crane operations, and other tasks.[36]

---

[26] Id.  Gate valves are either installed in the hull of a vessel during initial construction, or retro-fitted in dry dock to install the gate valve into the hull of the vessel.
[27] Id.
[28] Docket No. 128-2 (Declaration of Michael MacMillan) (Photograph of USBL Control Panel). ROVSV).
[29] Docket No. 128-2 (Declaration of Michael MacMillan).
[30] Docket No. 128-2 (Declaration of Michael MacMillan). (Photograph of USBL Deployment Machine and Pole Installed Through Deck of ROVSV).
[31] Docket No. 128-2 (Declaration of Michael MacMillan) (Photograph of USBL Pole Prior to Installation).
[32] Docket No. 128-2 (Declaration of Michael MacMillan).
[33] Docket No. 128-2 (Declaration of Michael MacMillan) (Illustration of USBL System Use).
[34] Docket No. 128-2 (Declaration of Michael MacMillan) (Photographs of USBL Monitors).
[35] Docket No. 128-2 (Declaration of Michael MacMillan).
[36] Id.

CI USBL systems are tied into the ROVSV's Dynamic Positioning ("DP") System.[37]  A DP system is an automated system that maintains the ROVSV's position and heading by using wind sensors, motion sensors, gyrocompasses, and the ROVSV's propellers and thrusters to automatically adjust for the magnitude and direction of environmental forces on the ROVSV.[38]  A DP system is essential to hold position of the ROVSV during ROV operations.[39]  Anchoring to the seafloor is rarely, if ever used by ROVSVs, because it is not an option due to water depth, or because of the danger of snagging a pipeline with the anchor.[40]  USBL systems owned and operated by CI have been installed on all ROVSVs on which CI has conducted ROV operations since inception of the Company, including the M/V Alyssa Chouest, on which Halle worked as an ROV Supervisor from June 2012 through September 23, 2015.[41]  The referenced schematic diagram illustrates the interconnection between the USBL system and the ROVSV's computerized navigation DP system.[42]  As such, the USBL system operated by the ROV Crew further augments and assists with the navigation of the ROVSV.

The ROV crew must submit a Permit to Work, and receive approval from the ROVSV Master, before raising or lowering the USBL pole, or launching or recovering the ROV.[43]  As shown in the Permit to Work, dated August 31, 2015 from the M/V Alyssa Chouest, an ROV Crew headed by ROV Supervisor Kyle Halle, is requesting authorization to lower and raise the USBL pole and to deploy and recover the ROV.[44]  Likewise, in the CI Daily Progress from the M/V Alyssa Chouest from November 8, 2012, reflecting a work shift during which Kyle Halle was

---

[37] Id.
[38] Id.
[39] Id.
[40] Id.
[41] Id.
[42] Docket No. 128-2 (Declaration of Michael MacMillan) (Schematic Diagram of USBL System).
[43] Docket No. 128-2 (Declaration of Michael MacMillan).
[44] Docket No. 128-2 (Declaration of Michael MacMillan) (Permit to Work Dated August 31, 2015).

ROV Supervisor, the entry at 11:50 reflects the ROV Crew deploying the USBL pole.[45]  The ROV Crews' deployment and utilization of the USBL system aboard the ROVSVs highlights the symbiotic relationship between the ROV Crews and the ROVSV's in accomplishing the mutual "navigational mission" of conducting ROV operations.

The ROV systems are long term installations welded to the deck of the ROVSV, and the ROV system was attached to the M/V Alyssa Chouest for the more than three years Halle worked on that ROVSV.[46]  Halle testified the ROV system took up a substantial part of the deck space on the ROVSV.[47]  The ROV Crew would clean the decks of the ROVSV in their area.[48]  Halle testified he would paint the deck of the ROVSV with non-skid paint.[49]  The ROV Crew would take their meals along with the ROVSV Crew and would sleep in the same quarters that were provided to the ROVSV Crew.[50]

### D.  ROVSV Master's Role in ROV Operations

The Captain or Master of an ROVSV has absolute authority over the vessel, and Halle testified he and his Crew could not disregard an instruction of the Master of the ROVSV.[51]  For every twelve-hour shift worked by an ROV Crew, the ROV Supervisor is required to submit in advance to the ROVSV Master written authorization requests, which are referred to as Permits.[52]  In the Permit, which is signed by the ROV Supervisor, the Supervisor communicates to the Master what tasks are to be performed, as

---

[45] Docket No. 128-2 (Declaration of Michael MacMillan) (Daily Progress Report Dated November 8, 2012).
[46] Docket No. 112-3 (Page 17) (Kyle Halle Deposition); Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).
[47] Docket No. 112-3 (Page 29) (Kyle Halle Deposition).
[48] Docket No. 112-3 (Page 31) (Kyle Halle Deposition).
[49] Docket No. 112-3 (Page 30) (Kyle Halle Deposition). Halle's sworn deposition testimony that he painted the deck of the ROVSV directly contradicts his February 5, 2016 Sworn Declaration in which he represented to this Court that he never painted the ROVSV.  Docket No. 17-1 at ¶ 7 (February 5, 2016 DocuSigned Sworn Declaration of Kyle Halle).
[50] Docket No. 112-3 (Page 10) (Kyle Halle Deposition).
[51] Docket No. 112-3 (Page 8-9) (Kyle Halle Deposition); Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).
[52] Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy); Docket No. 112-6 (Pages 1-5) (Declaration of Captain James Alfrey).

well as a Job and Safety Analysis ("JSA"), which addresses to the Master the risk assessments associated with the particular tasks.[53] The ROV Supervisor would bring the written Permit to the Master in the Bridge of the ROCSV for his signed approval.[54] Regardless of the ROV Tasks requested, if the ROVSV Master does not believe the ROV operation can be performed safely, because of weather or sea conditions, proximity to structures or because it would cause problems with the navigational integrity of the ROVSV, the Permit will be denied and the ROV operations will not be conducted. [55]

During the course of a shift, an ROV Supervisor sometimes will submit additional Permits to the Master for his signed approval in regard to additional ROV tasks.[56] The ROV Supervisor also submits Permits to the ROVSV Master for approval for non-subsea operations, such as maintenance or repairs or when the ROV Crew is going to be working at heights on the ROVSV. [57] In his deposition, Halle testified that prior to launching the ROV, he would have to get permission from Captain Alfrey to deploy the ROV from the ROVSV.[58] Halle testified that while working on the M/V Alyssa Chouest, Captain Alfrey had the authority to reject his requests regarding ROV operations, and in fact exercised that authority.[59]

According to Halle, the ROV can stay underwater as long as necessary to perform the required tasks; up to days at a time.[60] If the ROV was still underwater at the end of one ROV Crew's twelve-hour shift, the replacement ROV Crew would come in and take over the ongoing operations.[61] During ROV operations, Halle would be in communication with the Bridge of the

---

[53] Id.
[54] Id.
[55] Id.
[56] Id.
[57] Id.
[58] Docket No. 112-3 (Page 13) (Kyle Halle Deposition).
[59] Docket No. 112-3 (Page 23) (Kyle Halle Deposition).
[60] Docket No. 112-3 (Page 24) (Kyle Halle Deposition).
[61] Docket No. 112-3 (Page 28) (Kyle Halle Deposition).

ROVSV from the ROV Control Van through a two-way radio connection that was kept as an open line during the entire operation:[62]

> **Q.** And when your ROV was in the water, was this an open line? Did you maintain communications during this time?
> **A.** Yes, through that, yes.
> **Q.** How long would an ROV stay in the water doing whatever it was doing?
> **A.** Again, it would - anywhere from – it could be in the water for an hour to days. [63]

Halle would utilize the two-way radio to request navigational movements of the ROVSV to facilitate the positioning of the ship to allow the ROV to access the required subsea location.[64] Halle testified that when the ROV was doing pipeline surveys or sea bottom surveys, **the ROVSV would actually be following the ROV, with the ROVSV's navigational course dictated by the ROV's subsea navigational course.**[65] The Master of the ROVSV is constantly aware of what is going on during ROV operations through a monitor screen in the Bridge that shows the exact underwater video images seen by the ROV Screw in the Control Van.[66] Likewise, in the ROV Control Van, there is video monitor or "survey screen" which allows the ROV Crew to see the ROVSV's location, heading, speed and shows the ROV's point of reference in regard to the ROVSV.[67]

---

[62] Docket No. 112-3 (Page 24) (Kyle Halle Deposition); Docket No. 112-6 (Pages 1-5) (Declaration of Captain James Alfrey); Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).

[63] Docket No. 112-3 (Page 24) (Kyle Halle Deposition). Halle's sworn deposition testimony reflecting the constant communications between the ROVSV Master and himself during ROV operations contradicts his prior sworn representation to this Court that his communications and interaction with the Master "only took a matter of seconds." Docket No. 17-1 at ¶ 12 (February 5, 2016 DocuSigned Sworn Declaration of Kyle Halle).

[64] Docket No. 112-3 (Page 21) (Kyle Halle Deposition).

[65] Docket No. 112-3 (Page 22) (Kyle Halle Deposition).

[66] Docket No. 112-6 (Pages 1-5) (Declaration of Captain James Alfrey); Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).

[67] Docket No. 112-3 (Page 79) (Kyle Halle Deposition); Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy). Halle's sworn deposition testimony that there was a monitor in the Control van relating

For the underwater installation of significant structures, such as subsea trees and manifolds, ROVSV Crew members will work with the ROV Crew to rig such heavy equipment into slings and lower the equipment to sea floor utilizing the ROVSV's ship's crane, which is independent of the ROV winch system.[68]  The ship's crane will be operated by a member of the ROVSV Crew, and the ROV Crew will communicate with the crane operator as well as the Bridge to facilitate Vessel navigation for the placement of the equipment for subsequent installation by the ROV Crew. [69]  As detailed above, the interactions between the ROV Crews and the ROVSV Master and Crew are integral to the operation of the vessel and accomplishment of the vessel's sole mission.

### E.  ROV Crew Positions

In its operations of ROVs, CI has different levels of employees on an ROV Crew, all of whom hold different job positions and have different job responsibilities and duties.[70]

### 1.  <u>ROV Superintendent</u>

Halle testified that on some ROVSVs there would be an ROV Superintendent, which was one level above his own position of ROV Supervisor and was a supervisory position over his position.[71]  Superintendents would sometimes be assigned to an ROVSV that had more than one ROV system installed, but Halle testified that on the M/V Alyssa Chouest, which had a single ROV system, there was no Superintendent assigned.[72]

---

the ROVSV's location, heading and speed contradicts his February 5, 2016 Sworn Declaration in which he represented to this Court that while in the Control Van he was unaware of navigational issues affecting the ROVSV. See Docket No. 17-1 at ¶ 14 (February 5, 2016 DocuSigned Sworn Declaration of Kyle Halle).
[68] Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).
[69] Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).
[70] Docket No. 112-3 (Page 32) (Kyle Halle Deposition); Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).
[71] Docket No. 112-13 (Pages 1-2) (Job Description – ROV Superintendent); Docket No. 112-3 (Page 35) (Kyle Halle Deposition).
[72] Docket No. 112-3 (Page 35) (Kyle Halle Deposition); Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).

PD.27513897.1

## 2.  **ROV Supervisor**

Halle testified that as the ROV Supervisor on the M/V Alyssa Chouest, he was the senior CI employee on the ROVSV and was in charge of the entire ROV system and its operational activities during each of his twelve-hour shifts.[73]  As Supervisor, Halle had the independent authority to shut down ROV operations at any time.[74]  The ROV Supervisor serves as the liaison and main contact with the ROVSV Master, the oil or gas industry client representative on the ROVSV, and CI's onshore headquarters in regard to all ROV operations taking place on the vessel.[75]  The ROV Supervisor would communicate with the Master of the ROVSV during ROV operations.[76]  In his deposition, Halle identified CI's written Job Description for the position of ROV Supervisor and testified as to his performance of the listed duties.[77]  As Supervisor, Halle coordinated and supervised the two ROV Pilot Technicians who made up the rest of the ROV Crew.[78]  The ROV Supervisor is responsible for all administrative duties, such as the preparation and submission of Permits to the ROVSV Master, the preparation and signing of the Daily Progress Reports ("DPR"), which records everything that took place on the ROVSV in regard to ROV operations, preventive maintenance reports, supply requisitions, daily safety meeting reports, watch keeping records, video logs and shift handover documents.[79]  As Supervisor, Halle would provide training to the Pilot Technicians under him and would conduct and submit performance

---

[73] Docket No. 112-3 (Page 37-39) (Kyle Halle Deposition).
[74] Docket No. 112-3 (Page 42) (Kyle Halle Deposition).
[75] Docket No. 112-3 (Page 37-38) (Kyle Halle Deposition).
[76] Docket No. 112-3 (Page 23-25) (Kyle Halle Deposition).
[77] Docket No. 112-14 (Pages 1-2) (Job Description – ROV Supervisor); Docket No. 112-3 (Page 36-48) (Kyle Halle Deposition).
[78] Docket No. 112-3 (Page 39-40) (Kyle Halle Deposition); Docket No. 112-14 (Pages 1-2) (Job Description – ROV Supervisor).
[79] Docket No. 112-3 (Page 33, 44-48) (Kyle Halle Deposition); Docket No. 112-14 (Pages 1-2) (Job Description – ROV Supervisor); Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).

evaluations to CI for the Pilot Technicians he supervised.[80]  To be promoted to Supervisor requires having gained technical and operational experience in the various grades of Pilot Technicians and having received favorable performance evaluations.[81]  Halle testified that when he was a Senior Pilot Technician, the performance evaluations he was given by his Supervisor were given weight by the CI and those evaluations were the basis for his ultimate promotion to the position of ROV Supervisor.[82]

### 3.  ROV Senior Pilot Technician

Halle testified that Senior Pilot Technicians conducted maintenance on the ROV system and had the opportunity to actually pilot the ROV during subsea operations.[83]  In addition to piloting the ROV, the Senior Pilot Technician will have significantly more experience and will cross-train the lower level Technicians.[84]

### 4.  ROV Pilot Technician I

A Pilot Technician I will have slightly more experience and slightly more responsibilities than an entry level employee [85]  A Pilot Technician I will essentially shadow the ROV Senior Pilot Technician to gain experience in the actual operation of the ROV and in more advanced aspects of maintenance and repair of the ROV system.[86]

---

[80] Docket No. 112-3 (Page 46, 57-58, 66) (Kyle Halle Deposition); Docket No. 112-14 (Job Description – ROV Supervisor).
[81] Docket No. 112-3 (Page 64) (Kyle Halle Deposition); See Halle Deposition at 105; Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).
[82] Docket No. 112-3 (Page 46, 57-58) (Kyle Halle Deposition); Docket No. 112-14 (Pages 1-2) (Job Description – ROV Supervisor).
[83] Docket No. 112-15  (Pages 1-2) (Job Description – ROV Senior Pilot Technician); Docket No. 112-3 (Page 33) (Kyle Halle Deposition).
[84] Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).
[85] Docket No. 112-16 (Page 1) (Job Description – ROV Pilot Technician I); Docket No. 112-3 (Page 33) (Kyle Halle Deposition); Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).
[86] Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).

### 5. ROV Pilot Technician II

Halle testified that a ROV Pilot Technician II is an entry level position.[87] Pilot Technician II's essentially have no experience and require full training as to maintenance and repair of the ROV system.[88]

### 6. Positions of Conditional Opt-In Class Members

Pursuant to the Court's conditional certification of class in this matter, 77 individuals, including Halle, joined the class.[89] However, as noted in Defendants' Summary Judgment Motion, one of these individuals was improperly made a member of the class, and as such, there is properly a 76-member class. Of the 76 proper members of the class, including Halle, their positions are as follows:

- Five (5): ROV Superintendents.
- Twenty (20): ROV Supervisors (Includes Halle).
- Twenty-two (22): ROV Senior Pilot Technicians.
- Twenty (20): ROV Pilot Technician I's.
- Nine (9): ROV Pilot Technician II's.[90]

Of the class members, during the relevant period, five (5) ROV Superintendents earned yearly incomes in excess of $100,000.00, and sixteen (16) ROV Supervisors, including Halle, also earned yearly incomes of over $100,000.00.[91] For example, Halle made $128,140.87 in 2013 while working as an ROV Supervisor and made $151,679.61 in 2014.[92] In 2015, in which he

---

[87] Docket No. 112-17 (Pages 1-2) (Job Description – ROV Pilot Technician II); Docket No. 112-3 (Pages 32-33) (Kyle Halle Deposition); Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).
[88] Docket No. 112-12 (Pages 1-8) (Declaration of ROV Supervisor Randall Roy).
[89] Docket Entry No. 75-88, 90,92-97 (Notices of Filing Consent).
[90] Docket No. 112-18 (Pages 1-3) (Chart of Job Positions of Class Members).
[91] Docket No. 112-19 (Chart of Combined Gross Wages of Class Members 2012 – Present) **[CONFIDENTIAL – FILED UNDER SEAL PURSUANT TO MOTION/ORDER TO SEAL]**
[92] Docket No. 112-20 (Pages 1-4) (Halle W-2's).

worked just through the end of September, he earned $99,147.89 from CI before ending his employment three months before the end of the calendar year, and would also have earned over $100,000.00 if he had worked the entire year.[93]

### F.  CI's Implementation of Day Rate Pay System in February 2011

Prior to February 2011, CI paid employees using a system that included a base salary, as well as an additional Standard Time Hourly Rate and Overtime Hourly Rate.[94]  Effective February 28, 2011, CI implemented a Day Rate pay system and sent out an individualized letters to all employees, including Halle, explaining the new pay structure as it would apply to them.[95]  The letter related, in the charts below, Halle's income under the existing rate, and the higher income he would receive under the new plan, as follows:

**Current Annual Figures** (based on 220 days offshore)

| Annual Salary | Offshore ST Hourly Rate | 40 hrs ST per week for 220 days | Offshore ST Hourly Total/year | Offshore OT Hourly Rate | 44 hrs OT per week for 220 days | Offshore OT Hourly Total/year | Current Pay system Offshore Annual Income (Salary +ST + OT) |
|---|---|---|---|---|---|---|---|
| $29,000.00 | $15.00 | 1264 | $18,960.00 | $22.50 | 1376 | $30,960.00 | $78,920.00 |

**New Day Rate Figures** (based on 215 days offshore)

| New Offshore Day Rate | Onshore Day Rate | Day Rate System Offshore Annual Income | Annual Difference b/t Prior Pay to Day Rate Pay |
|---|---|---|---|
| $378.32 | $151.33 | $81,338.75 | $2,418.75 |

---

[93] Docket No. 112-20 (Pages 1-4) (Halle W-2's).
[94] Docket No. 112-3 (Pages 60-61) (Kyle Halle Deposition).
[95] Docket No. 112-21 (Page 1) (February 3, 2011 Letter Explaining Day Rate); Docket No. 112-3 (Page 60-62) (Kyle Halle Deposition).

PD.27513897.1

Halle acknowledges he received the letter and that CI explained the calculations that were done to come up with the Day Rate.[96]  The Day Rate was calculated by taking employees' current annual income, including the regular time and overtime pay, and dividing it by 215 days for an Offshore Day Rate, then giving the employee an extra half an hour of their overtime hourly rate per day, resulting in a 2-3 percent increase in annual income per year.[97]  As such, under the prior system, Halle's annual income at that time was $78,920.00, and under the Day Rate, his new annual income was $81,338.75, and he admitted that under the new system he made approximately $2,400.00 more per year.[98]

On December 7, 2012, Halle was promoted to the position of ROV Senior Pilot Technician, and his daily offshore rate increased from $378.32 per day to $450.00 per day, and he signed the letter, agreeing and accepting the promotion and terms of the pay increase.[99]  On January 25, 2013, Halle was promoted to the position of ROV Supervisor, and his daily offshore rate increased from $450.00 per day to $515.00 per day, and he signed the letter, agreeing and accepting the promotion and terms of the pay increase.[100]  Halle subsequently received additional pay increases, and when last employed by CI, his daily offshore rate as an ROV Supervisor was $600.00 per day.[101]

---

[96] Docket No. 112-3 (Pages 60-62) (Kyle Halle Deposition); Docket No. 112-21 (Page 1) (February 3, 2011 Letter Explaining Day Rate).
[97] Docket No. 112-3 (Pages 61-62) (Kyle Halle Deposition); Docket No. 112-21 (Page 1) (February 3, 2011 Letter Explaining Day Rate).
[98] Docket No. 112-3 (Page 62) (Kyle Halle Deposition); Docket No. 112-21 (Page 1) (February 3, 2011 Letter Explaining Day Rate).
[99] Docket No. 112-22 (Pages 1-4) (December 7, 2012 Promotion Notice/Day Rate Increase); Docket No. 112-3 (Page 64) (Kyle Halle Deposition).
[100] Docket No. 112-23 (1-4) (January 25, 2013 Promotion Notice/Day Rate Increase); Docket No. 112-3 (Page 65) (Kyle Halle Deposition).
[101] Docket No. 112-3 (Page 68) (Kyle Halle Deposition).

### G. Termination of Halle's Employment with CI

Halle held his Supervisor position up until the last day he actually performed work for CI, which was September 23, 2015.[102]  On that date, Halle was called in for a meeting with his immediate supervisor, Operations Coordinator Chad Black, regarding his performance as an ROV Supervisor.[103]  In a letter dated September 29, 2015, Halle was informed he was being demoted back to the his former position of ROV Senior Pilot Technician, and his daily offshore rate would drop to $550.00, or a $50.00 reduction.[104]  The letter from CI noted that the demotion was based on poor performance by Halle during his last four-week hitch, that had resulted in another ROV Crew having to intervene in a project, and a three day shutdown of ROV operations.[105]

The letter informed Halle he had three days to sign the letter to accept the new position and to submit his updated professional resume, however, Halle testified he did not accept the position within the requested period because he disagreed with the evaluation and did not believe all the problems were his fault.[106]  On October 12, 2015, Black e-mailed Halle, relating the numerous prior efforts that had been made to contact him by telephone and e-mail, with no response from Halle, and that that he needed to sign the acceptance letter and submit the resume so he could be assigned to an offshore hitch leaving October 21, 2015.[107]  Halle disagreed with the assessment of his performance and the demotion, did not sign the requested the documents, and his employment with CI ended.[108]

---

[102] Docket No. 112-3 (Page 75) (Kyle Halle Deposition).
[103] Docket No. 112-3 (Page 72) (Kyle Halle Deposition).
[104] Docket No. 112-24 (Pages 1-4) (September 29, 2015 Demotion Notice/Day Rate Decrease); Docket No. 112-3 (Pages 67-68) (Kyle Halle Deposition).
[105] Docket No. 112-24 (Pages 1-4) (September 29, 2015 Demotion Notice/Day Rate Decrease).
[106] Docket No. 112-3 (Page 69) (Kyle Halle Deposition).
[107] Docket 112-25 (Pages 1-4) (October 5 – 12, 2015 E-Mail Chain); Docket No. 112-3 (Pages 70-71) (Kyle Halle Deposition).
[108] Docket No. 112-3 (Pages 73-74) (Kyle Halle Deposition).

## III. ARGUMENT AND AUTHORITY

### A.    Standard of Review

In this Court's Order certifying the conditional class, it relied upon the Fifth Circuit's two-step "similarly situated" test of *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216 (5th Cir. 1995), which is in accordance with the two-stage approach of *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). *See Johnson v. Big Lots Stores, Inc.*, 2007 U.S. Dist. LEXIS 96151 at *3 (E.D. La. Aug. 21, 2007) ("Since *Mooney* district courts in the Fifth Circuit have uniformly used [the *Lusardi* analysis] to determine whether a collective should be certified under the FLSA.").

The first stage of the *Lusardi* analysis has already occurred--determining "whether the putative class members' claims are sufficiently similar to merit sending notice of the action to possible members of the class." *Acevedo v. Allsup's Convenience* Stores*, Inc.*, 600 F.3d 516, 519 (5th Cir. 2010)*.* "As a court's decision at this first step is usually based only on the pleadings and affidavits, the standard is lenient and typically results in conditional certification." *Clay v. New Tech Global Ventures,* LLC, 2019 U.S. Dist. LEXIS 34306, *30, 2019 WL 1028532 (W. D. La. March 4, 2019).

Defendants' instant motion implicates the second stage of the *Lusardi* procedure, which "is typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial." *Mooney*, 54 F.3d at 1214. The Fifth Circuit has observed that "the *Lusardi* . . . line of cases, by its nature, . . . lends itself to *ad hoc* analysis on a case-by-case basis." *Id.* at 1213. "At this second stage, the burden is on [plaintiffs] to prove that the individual class members are similarly situated." *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N. D. Tex. 2008). Furthermore, the second stage is "more stringent" with respect to the showing required of plaintiffs. *Chapman v. LHC Grp., Inc.*, 126 F. Supp. 3d 711, 721 (E. D. La. 2015). "The decision whether to decertify a collective action is within a district court's discretion." *Vanzzini*, 995 F. Supp. 2d at 720 (citing *Mooney*, 54 F.3d at 1213).

- 17 -

With respect to the substantive standard, as noted above, the "FLSA does not define what it means for employees to be 'similarly situated' such that collective adjudication" of overtime claims is appropriate. *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 573 (E.D. La. 2008).  The *Lusardi* test for whether employees are similarly situated such that a matter can be collectively generally asks the Court to consider: "(1) the extent to which the employment settings of employees are similar or disparate; (2) the extent to which any defenses that an employer might have to overtime . . . claims are common or individuated; and (3) general fairness and procedural considerations."  *See id.*  "These three factors are not mutually exclusive, and there is considerable overlap among them." *Id.* at 574.  "[T]he more dissimilar plaintiffs are and the more individuated [defendants'] defenses are, the greater doubts there are about the fairness of a ruling on the merits—for either side—that is reached on the basis of purportedly representative evidence." *Id.*

**B.    Opt-in Plaintiffs' Claims Cannot be Properly Adjudicated as a Collective Action and the *Mooney/ Lusardi* Factors Require Decertification of Conditional Class**

The lead plaintiff in a collective action, in this case **Halle**, "bears the burden of showing that [he] and the opt-in plaintiffs are similarly situated." *Burke v. Management & Training Corp.*, 2018 U.S. Dist. LEXIS 143266, *4 (N. D. Miss. Aug. 22,  2018).  If the lead plaintiff fails to carry his burden, the collective action should be decertified.  *Id.*  Halle cannot meet this burden.

**1.   Disparity of Employment Settings Factor Against Collective Adjudication**

The first factor of the similarly situated analysis assesses job duties, geographic locations, and supervision. *Reyes v. Texas EZPawn, L.P.*, 2007 U.S. Dist. LEXIS 1461, 2007 WL 101808, at *2 (S. D. Tex. 2007).  To determine whether Halle and the Opt-In plaintiffs were similarly situated, the court must make a factual inquiry into the work performed by each plaintiff.  *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 574 (E. D. La. 2008) (noting that the inquiry is "highly fact-intensive" one).

### a. Job Duties

In this case, as detailed in the factual background above, the work performed by Halle was significantly different than the duties of the rest of the Opt-In Plaintiffs. As acknowledged by Halle in his deposition, he was the senior CI employee on the ROVSV Alyssa Chouest, was the exclusive Company liaison with the ROVSV Master, the oil **industry** client, and CI's onshore headquarters, whereas, the ROV Technicians had no such interaction.[109] He supervised and evaluated the ROV Technicians under his authority, and was responsible for all administrative duties.[110] Unlike the ROV Technicians under his supervision, Halle communicated and conferred on a daily basis directly with the ROVSV Master as to what ROV operations would be permitted on the ROVSV and maintained constant communications with the Master during ROV operations.[111]

### b. Job Locations / International v. Domestic

The geographic locations in this matter are perhaps more significant in this case, as opposed to FLSA cases involving job duties performed onshore. During the relevant period, CI had ongoing ROV operations on numerous ROVSV's operating in different parts of the world, conducting different jobs, under different conditions, under different supervision, and for different clients, and each of these distinctive worksites are not properly comparable to each other.

For example, in this **instance**, it is undisputed that for the last three years and three months of his employment, Halle **only** worked on board the M/V Alyssa Chouest, and he worked **only** in the Gulf of Mexico.[112] In marked contrast, 32 of the Opt-In Plaintiffs worked on foreign-flagged vessels, that conducted ROV operations in foreign waters for some or all of the relevant period, encompassing a total

---

[109] Docket No. 112-3 (Pages 23-25, 36-48) (Kyle Halle Deposition); Docket No. 112-14 (Pages 1-2) (Job Description – ROV Supervisor).
[110] Docket No. 112-3 (Pages 33, 39-40, 44-48) (Kyle Halle Deposition); Docket No. 112-14 (Pages 1-2) (Job Description – ROV Supervisor).
[111] Docket No. 112-3 (Page 24) (Kyle Halle Deposition).
[112] Docket No. 112-3 (Pages 11-12) (Kyle Halle Deposition).

number of 641 workweeks, with some working exclusively in this status.[113]  These employees worked in the waters of Angola, Australia, Brazil, China, Congo, Denmark, Equatorial Guinea, Germany, Ivory Coast, Norway, Trinidad and the United Kingdom.[114]  The ROV operations on these foreign-flagged ROVSV's in foreign waters varied widely, depending on the client needs and the tasks to be performed, and for all practical purposes, each was its own separate unique worksite for the individualized CI ROV operations.  More importantly, as detailed in Defendants' Motion for Summary Judgment, because these Opt-In Plaintiffs were **not** covered by the FLSA for the workweeks aboard foreign-flagged ROVSV's in foreign waters, and as such are not similarly situated to Halle, whose workweeks took place entirely within the Gulf of Mexico.[115]

## c.  Supervision

As detailed above, on each ROVSV, there would be two ROV Supervisors, one for each twelve-hour shift, who in turn would supervise the two ROC Crew members under them.[116]  As such, the majority of the conditional class were all under different supervisors on different vessels under a wide range of locations, assignments and clients, and were not similarly situated.

## d.  Halle's Unsupported Claims of Working More than Twelve Hours a Day Cannot be Attributed to Class Members Working on Different ROVSV's in Different Parts of the World

To the extent Halle makes unsupported allegations that he sometimes worked upwards of 14 to 16 hours per day, as opposed to a regular twelve-hour shift, there is no way that can be accurately or fairly

---

[113] Docket No. 112-26 (Pages 1-25) (Declaration of Michael MacMillan) **[CONFIDENTIAL – PORTIONS FILED UNDER SEAL PURSUANT TO MOTION/ORDER TO SEAL]**; Docket No. 112-27 (Page 1(HMC 2013 Schedule); Docket No. 112-28 (Pages 1-3) (Guaranteed Days 2013); Docket No. 112-29 (Pages 1-2) (Guaranteed Days 2014); Docket No. 112-30 (Pages 1-2) (Guaranteed Days 2015); Docket No. 112-31 (Page 1) (ROV Foreign 2014 Utilization); Docket No. 112-32 (Page 1) (ROV Foreign 2015 Utilization); Docket No. 112-33 (Page 1) (ROV Foreign 2015 Utilization).
[114] Docket No. 112-26 (Pages 1-25) (Declaration of Michael MacMillan) **[CONFIDENTIAL – PORTIONS FILED UNDER SEAL PURSUANT TO MOTION/ORDER TO SEAL]**
[115] Docket No. 112-2 (Pages 31-33) (Defendants' Memorandum in Support of Motion for Summary Judgment).
[116] Docket No. 112-3 (Pages 35-36) (Kyle Halle Deposition).

imputed to what occurred on different ROVSVs in different parts of the world, under different management by different ROV Supervisors and under a wide range of different circumstances. *See e.g., Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 283 (N. D. Tex. April 24, 2008) (decertifying class on basis that "Plaintiffs' claims vary from store to store and manager to manager"); *Johnson v. TGF Precision Haircutters, Inc.*, Civ. A. H-03-3641, 2005 U.S. Dist. LEXIS 44259, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) (granting decertification of FLSA collective action despite evidence of an "overarching policy" to deny overtime where "there was a substantial variance of experiences by different plaintiffs under different mangers and at different shops around Texas"...which "appears to have contributed materially to the dissimilarities of Plaintiffs' experiences."); *Reyes v. Texas Ezpawn, L.P.*, 2007 U.S. Dist. LEXIS 78846, 2007 WL 3143315, *1 (S. D. Tex. Oct. 24, 2007 (granting decertification of FLSA collective action where Plaintiffs alleged uniform policy of misclassification where the evidence revealed a wide array of differences in plaintiffs' individual experiences depending on the management practices of individual store managers); *Wilson v. Navika Capital Group, LLC*, 2014 U.S. Dist. LEXIS 76469, *22, 2014 WL 2534904 (S.D. Texas June 4, 2014) (" . . . however, where disparate factual issues, and the issues of damages in particular, predominate over any common issues of law, the remedial purposes of the statute do not justify proceeding collectively.").  As to this factor, Halle cannot meet his burden of showing that he and the Opt-In plaintiffs are similarly situated.

### 2.  Individuated Defenses Factor Against Collective Adjudication

The similarly-situated inquiry requires courts to examine each opt-in plaintiffs' job duties "in light of the exemption criteria." *Johnson*, 561 F. Supp. 2d at 574.  Courts within the Fifth Circuit and in other jurisdictions have recognized that resolving the defense of a FLSA exemption requires individualized analysis of every class member and have denied conditional certification on this basis. *See e.g. Harris v. Fee Transp. Servs., Inc.*, 2006 WL 1994586, at *5 (N. D. Tex. May 15, 2006); *Tolentino*, *supra*; *Smith v.*

- 21 -

*Frac Tech Servs.*, LLC, 2011 WL 96868, at \*17-18 (E. D. Ark. Jan. 11, 2011); *Riech v. Homier Distrib. Co.*, 362 F.Supp.2d 1009, 1013-14 (N.D. Ind. 2005).

As detailed in Defendants' Memorandum in Support of Motion for Summary Judgment, the FLSA's executive, administrative and highly compensated exemptions apply to Halle, based on his duties, responsibilities and his undisputed high level of compensation.[117]   This is in contrast to the Opt-In Plaintiffs employed as ROV Technicians, to which these exemptions would not apply.  *See Vanzzini*, 995 F. Supp. 2d at 720-721 ("decertifying collective action where on plaintiff was subject to the Motor Carrier exemption defense and other class members were not).

In addition, unlike Halle, who **_only_**  worked aboard a U.S.-flagged ROVSV in the Gulf of Mexico, other members of the class worked on foreign-flagged vessels in foreign waters.  As detailed in Defendants' Summary Judgment Motion, this raises an additional defense for Defendants and illustrates the dissimilarity between Halle and those other class members, because the latter would **_not_** be covered by the FLSA for such work under recent authority within the Fifth Circuit.  *See Senegal v. Fairfield Indus.*, 2019 U.S. Dist. LEXIS 70709 \*3-4 (S. D. Tex. April 26, 2019) ("For any workweek where a Plaintiff worked exclusively aboard a foreign-flagged vessel in foreign waters, that Plaintiff is not covered by the FLSA for that workweek.").  *See also Goodly v. Check-6, Inc.,* 2018 U.S. Dist. LEXIS 183911, 2018 WL 5316356, at \*4-5 (N.D. Okla. Oct. 26, 2018) (holding that the FLSA did not "apply to workweeks in which the plaintiffs performed all work exclusively aboard foreign-flagged vessels outside U.S. territorial waters and outside the Gulf of Mexico").  Where a Defendant's defenses are fact-specific as to the particular clients, as in the instant case, courts find this factor weighs against collective adjudication.  *See Rios v. Classic S. Home Constr.*, 2016 U.S. Dist. LEXIS 61644, \*11 (E. D. La. May 9, 2016).

---

[117] Docket No. 112-2 (Pages 27-31) (Defendants' Memorandum in Support of Motion for Summary Judgment).

### 3.    General Fairness and Procedural Considerations Factor Against Collective Adjudication

The third factor to weigh requires an examination of fairness and procedural considerations. *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 534 (S. D. Tex. 2008).  Under this factor, the Court considers "the primary objectives of the FLSA § 216(b) collective action: (1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity". *Reyes*, 2007 U.S. Dist. LEXIS 1461, 2007 WL 101808, at *6 (citing *Hoffmann—La Roche, Inc. v. Sperling*, 493 U.S. 165, 170, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989)).  "However, 'the Court must also determine whether it can coherently manage the class in a manner that will not prejudice any party.'" *Mahoney v. Farmers Ins. Exch.*, 2011 U.S. Dist. LEXIS 108744, 2011 WL 4458513, at *10 (S. D. Tex. Sept. 23, 2011).

In this case, fairness and procedural considerations weigh in favor of **decertification**.  It bears repeating that significant differences exist in the work performed and the responsibilities of the members of the class, in regard to the applicable FLSA exemptions that exist in this case.  "Such diversity in individual employment situations inhibits [Defendants] from proving [their] statutory exemption defense as to all  opt-in plaintiffs on the basis of representative proof." *Johnson*, 561 F. Supp. 2d at 579.

To properly defend itself, Defendants would have to "pick the class apart, plaintiff by plaintiff, going into the day to day duties of each of the plaintiffs to prove that these [lieutenants] are properly classified as exempt." *Id.* at 586.  A recent District Court opinion within the Fifth Circuit noted that in such a situation, the parties would be conducting separate mini-trials to resolve each individual's claim, and "[s]uch a result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach." *Burke v. Management & Training Corp.*, 2018 U.S. Dist. LEXIS 143266, *8-9, 2018 WL 4038115 (N. D. Miss.

- 23 -

Aug. 22, 2018) (quoting *Hinojos v. Home Depot, Inc.*, 2006 U.S. Dist. LEXIS 95434, 2006 WL 3712944, at *2 (D. Nev. Dec. 1, 2006)).

### 4. **Inconsistencies** Between Halle's Sworn Declaration and Subsequent Sworn Deposition Testimony

As discussed above, there are glaring inconsistencies between the facts Halle represented under oath to this Court in his February 5, 2016 Declaration, and how he testified in his sworn deposition testimony on May 16, 2019. Without belaboring the point, a few examples are instructive. In his sworn 2016 Declaration, he attested under oath to this Court that his daily communications with the ROVSV Master "only took a matter of seconds" while in his 2019 deposition, he testified as to the near constant communications and interactions he had with the Master during ROV operations.[118] In his 2016 Declaration, he claimed that while he was in the ROV Control van, he was unaware of navigational issues affecting the ROVSV, but in his 2019 deposition, he acknowledged at all times he had a monitor showing the ROVSV's location, heading and speed, and made no mention of the ROV Crew's control of the USBL navigational system.[119] Likewise, in his 2016 Declaration, Halle attested to this Court he never painted the deck of the ROVSV, while in his 2019 deposition, he testified that he did indeed paint the deck of the vessel.[120]

Courts grant decertification of FLSA collective actions where there are inconsistencies in the declarations and depositions of opt-in claimants, requiring cross-examination of each opt-in claimant. *See Lugo v. Farmer's Pride Inc.*, 737 F.Supp.2d 291, 310, 315 (E.D. Pa. 2010); *Alexander v. Caralstar Indus.*, 2013 WL 1123615 (N.D. Ill. Mar. 19, 2013). Given the issues of credibility and veracity regarding Halle's inconsistent testimony under oath, cross-examination of

---

[118] See footnote 63.
[119] See footnote 67.
[120] See footnote 49.

each FLSA claimant is required in order for the fact-finder to determine the credibility (or lack thereof) of each opt-in claimant.

## IV. CONCLUSION

Because resolution of the purported class claims would require significant individualized determinations and considerations, Defendants would be unable to fairly defend themselves on the basis of representative proof and this matter is not suitable for collective action. Accordingly, for all the reasons discussed herein, Defendants respectfully request the Court grant Defendants' Motion and decertify the conditional class, and that the Opt-In Plaintiffs' claims should be dismissed without prejudice.

THIS the 3rd day of December 2019.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:    /s/ David M. Korn
　　　　DAVID M. KORN (Bar #21676)
　　　　MARK FIJMAN (Bar #37680)
　　　　Canal Place, 365 Canal Street, Suite 2000
　　　　New Orleans, Louisiana 70130-6534
　　　　Telephone: 504-566-1311
　　　　Telecopier: 504-568-9130
　　　　Email: david.korn@phelps.com
　　　　　　　mark.fijman@phelps.com

**ATTORNEYS FOR DEFENDANTS,**
**GALLIANO MARINE SERVICE, LLC and**
**C-INNOVATION, LLC**

- 25 -

PD.27513897.1